## Thompson v. First National Bank of Harrodsburg.

(Decided June 12, 1928.)

### Appeal from Mercer Circuit Court.

1. **Mortgages.**—Where facts showed that defendant placed title to property in bank as security for defendant's indebtedness then existing and prospective, but defendant was given free rein in its management, this did not constitute "technical trust" making bank liable for mismanagement of property, and court properly refused to submit issue regarding losses occasioned by bank's alleged negligence in that regard.

2. Bills and Notes.—In action on notes, evidence of negligence of plaintiff bank, holding title to property in another state as security for indebtedness in employment of attorney to sell property, held insufficient for jury.

3. Principal and Agent.—If C., employed to sell defendant's property to which bank held title as security for debts due from defendant, was agent of each to extent of respective interests and bank retained right to control and direct C.'s actions, defendant was not liable to bank for its loss occasioned by agent's defalcations and should not be required to pay lien debts existing at time of such defalcation.

4. Principal and Agent.—In action by bank on notes, question whether party selling defendant's property, to which bank held title as security, which party was alleged to have embezzled money, was acting as agent of both bank and defendant to extent of respective interests so as to require bank to bear its loss due to agent's defalcation held for jury.

5. Bills and Notes.—In action by bank on notes, evidence of whether bank holding title to defendant's property as security received payment of $16,000 on assignment of mortgage held insufficient for jury.

6. Bills and Notes.—In action on notes by bank which had held title to defendant's property as security, evidence of whether loss was caused by bank's action in extending time of payment for property after sale and in assigning mortgage to agent making sale, who was alleged to have embezzled money, held insufficient for jury.

ROBERT S. ALCORN, THOMAS D. SLATTERY, GALVIN & TRACY and CHARLES CORN for appellant.

E. H. GAITHER and C. E. RANKIN for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing.

The First National Bank of Harrodsburg instituted this action against Col. John B. Thompson asking recovery on seven promissory notes, aggregating $13,225. Defendant admitted the execution of the notes, but by way of counterclaim in an answer of several paragraphs pleaded that, for the purpose of securing his indebtedness to the bank then existing and to be incurred in the future, on the 12th day of December, 1917, at the instance of the bank, he caused the legal title to certain real estate located at 848 Manhattan avenue, Brooklyn, N. Y., to be conveyed to it in trust. This property was of the value of $38,000, but was incumbered by a mortgage for $16,000 which he later paid and caused to be assigned to the bank vesting a clear legal title in it. The bank accepted the

trust and agreed that upon a sale of the property it would deduct his indebtedness due it and pay the balance of the proceeds to him. Thereafter the bank asserted title in and exercised full ownership and control over the property, including leasing, listing, and assessing in its own name, as well as the collection of rents, and finally made a sale and conveyance thereof; the further allegations being that by negligence and carelessness the bank, as trustee, lost $10,000 in rentals, for which he asked recovery. He also alleged that the property was of the value of $38,000, and so known to be by the bank; that the bank, as trustee, had made an apparent sale thereof to one Anton Berger for the sum of $30,225, whereas the real purchaser was Ignatius P. A. Byrne who paid the price of $38,000, but that the bank did not account to him for any of the sale price, and sought a recovery of this sum in addition to the alleged loss of rentals, making a total claim for $48,000, and asked an accounting and for the amount of his indebtedness to be deducted therefrom and he be awarded judgment for the balance. In its reply the bank denied the existence of a trust or any negligence or misconduct upon its part in either renting or selling, but alleged affirmatively that all the transactions mentioned were done at the instance and with the approval of the defendant, who received on the sale of the property the sum of $6,600, the full amount realized therefor. Other appropriate pleadings made up the issues. In a jury trial a verdict was returned in favor of plaintiff and judgment entered accordinlgy. Plaintiff appeals.

The major question is as to which of the parties is liable for the defalcation of Hal S. Corbett, a New York attorney, who sold the property and collected the purchase price under a power of attorney, though for a determination of all the issues it is necessary to set out the various transactions between them. These transactions covered a number of years, and the facts though developed in detail are involved and confusing. Col. John B. Thompson, now 81 years of age, was a prominent distiller at Harrodsburg, Ky., and at the passage of the Volstead Act had on hand a large quantity of Kentucky whisky. He was and is a man of unusual intelligence, of strong and vigorous personality, and possessed of a legal education. He was a patron and debtor of plaintiff bank and distantly connected with its former president, C. D.

Thompson, who died in January, 1919, and who was then succeeded by F. P. James. On the 3rd of October, 1917, Col. Thompson, by a writing duly executed, purchased the real estate mentioned in Brooklyn, N. Y., from P. A. Rowley, etc., at the price of $33,500. No cash was paid, but Col. Thompson assumed a mortgage debt of $16,000, then held by one Freudenberger, and executed a note to himself for $17,500, and indorsed this note to the "Hargate Corporation," and further agreed for that corporation to take charge of and assume full control over the property and use the income in liquidation of the debt. In conformity with this agreement, on December 12, 1917, a blank deed was executed to Col. Thompson with leave to later insert the name of vendee. The deed was then delivered to the Hargate Corporation as security for the $17,500 note, a practice which seems to be sanctioned by usage in that state. Shortly afterward this note and the deed as security were delivered to and held by the Bank of Long Island, at Jamaica, N. Y. Neither note was paid at maturity and suit was filed on the Freudenberger note and judgment entered for a sale of the property. That judgment was paid by Col. Thompson on January 4, 1919, with funds advanced by the plaintiff bank, but instead of releasing the mortgage of record it was assigned to the bank, a proceeding also authorized in that state. As to the other note, there were considerable negotiations between the Bank of Long Island on one hand, and Col. Thompson and the Harrodsburg Bank on the other. This resulted in a payment of the note on January 15, 1920. Apparently, payment was made out of Col. Thompson's funds, but the deed with the name of the vendee still in blank was delivered to the Harrodsburg Bank, which at some time not appearing, but prior to Mr. James becoming president, inserted its name as the vendee in the deed, and on the 8th of August, 1919, mailed it to an attorney in New York for recordation. The Bank of Long Island had collected and accounted to Col. Thompson for the rents on this property from the date of the deed to January 1, 1919, and from that date to September 1, 1919, it remitted such rents to the bank at Harrodsburg, and the latter deposited these sums to the credit of Col. Thompson on a checking account. In the fall of 1919, Thompson and Geo. A. Lee, of New York, entered into an arrangement for a sale of some of Col. Thompson's liquors, and it was suggested that Lee, who also did busi-

ness as the "Hargate Corporation," should be authorized to lease the real estate. The bank acquiesced in this, and gave such authority in writing to the Hargate Corporation. James says that this was at Thompson's direction, but this is denied by Thompson. During the summer of 1921 Thompson and Lee disagreed, and some correspondence ensued between the bank and Lee in regard to the matter. Lee informed the bank that Thompson was indebted to the Hargate Corporation in the sum of $50,000, and that other corporations of that state were claiming that he was indebted to them in various amounts. Lee also intimated that the bank was not the bona fide owner of the Brooklyn property. The bank answered, saying that, "Its only interest in the property was for the security of its debt," although in all of the other correspondence it appears that the bank was claiming to be the owner of the property. At Col. Thompson's suggestion the bank employed an attorney by the name of Seigelman to collect past-due rents from Lee and to clear the title, and it also sent him the deed for recordation. Seigelman demanded the rents from Lee and was answered by an attorney for the Hargate Corporation, who claimed that Col. Thompson had been credited by more than the amount of his rents, on his indebtedness to that corporation. Seigelman collected and remitted some of the rents accruing after his employment, and this was credited to Col. Thompson's account. Seigelman also intimated that he was suspicious of the bank's title to the property, and at Col. Thompson's suggestion he was discharged as attorney.

Before proceeding to the more interesting developments which are to follow, it may be well at this point to elaborate some of the preceding transactions. It appears that aside from a short period from October 24, 1919, to February 13, 1920, Col. Thompson was indebted to the bank at all times in varying amounts. The bank loaned or advanced him the money to take up the Freudenberger note and in the negotiations with the Long Island Bank which claimed to be acting as trustee for Thompson, the Harrodsburg Bank wired, under date of November 11, 1918:

> "This bank has trust company powers now. The Board of Directors require a valuation by competent appraisers of the Brooklyn real estate. Send us appraisement so we can act intelligently. Thompson's valuation exaggerated. Writing you today."

And on the following day wrote at length confirming this telegram. On October 29, 1918, it wired the Bank of Long Island.

"Send us at once data for the Brooklyn property."

This telegram was confirmed by letter. On October 29th, Thompson wired the Bank of Long Island to the same effect and confirmed his wire on the 31st by letter. Notes of Thompson of date February 13, and of December 10, 1920, to the Harrodsburg Bank contained the notation, "Collateral data attached." On August 19, 1921, the bank wrote:

"We bought the property, paid for it, and it was deeded to us by Mr. Rowley."

And Mr. James testified in reference to the recordation of the deed:

"I thought it better to have it (the deed) recorded, it would be some evidence we had the property.

"Q. You thought it would be better secured that way? A. Yes, sir.

"Q. That is your reason? A. That would be my Idea."

In reference to the Freudenberger mortgage, Mr. James testifies:

"Q. That mortgage was held by the bank you say? A. That was made out and sent to the bank. We had the mortgage, and when the bank examiner was here—I don't remember, it was in May or in the fall—he always complained about Mr. Thompson's account. He did not like it and questioned me about it and wanted to know what security we had. At that time he owed us some money, and I told him that Mr. Thompson had property here, and in addition to that we had this assignment of this property on the mortgage in New York that was supposed to be worth $30,000. The examiner stated that we had to get rid of that mortgage, that we had no business holding collateral in another state."

And further testifies:

"The understanding was we were to hold the mortgage and also the deed. There were some par-

ties in New York who were claiming that Col. Thompson owed them, and they were trying to get hold of the property, and he wanted the bank to have the property to protect the bank for all the money he owed us at the time or that he might owe us in the future; he was doing his business there, but the main object was to keep these running mates of his up in New York from getting hold of something he did not owe them.''

However, it clearly appears that Col. Thompson was the dominant figure in all these transactions, and that the bank officials acted in accordance with his wishes. He dictated practically all the correspondence for the bank. He arranged the dispute between the two banks over the liquidation of the $17,500 note. He settled the Freudenberger judgment. He was credited by all the rents received by the bank. He selected Lee as agent to lease the property, and at his instance Lee was discharged and Seigelman was selected as attorney, and later he had Seigelman discharged; he also dictated the correspondence of the bank with a real estate broker, and was in a sense using the bank as an agent to further his own ends, except both parties recognized that the bank held title to the property as security for its debts.

After this time, while Col. Thompson's vigilance did not relax, it appears that the bank officials exercised more independence—perhaps were growing tired of the situation and desired it closed. Early in 1922, at the instance of Col. Thompson, Dyke Hazelrigg, of Frankfort, was employed to visit New York and investigate the matter and authorized to employ Hal S. Corbett of that city, which he did. Upon his return Hazelrigg wrote a joint letter to Thompson and the bank reporting the result of his trip and informing them that he had employed Mr. Corbett, ''a Kentuckian whom you know,'' and in his subsequent correspondence with them mailed duplicate letters to each.

On April 1, 1922, Hazelrigg wrote Corbett:

''The Harrodsburg Bank is after us again about getting the Freudenberger release. . . . ''

And on May 4th again wrote him:

''We have not been able to give the matter of the Harrodsburg Bank property immediate attention, and we have not been able to locate Col. Thomp-

son until yesterday. We are to see him some time this week and go over the matter with him, and according to telephone conversations he expects me to go to New York for him, or rather for the bank, as Col. Thompson has no interest in the matter other than to see that the bank gets its debt, which is probably more than the property will bring, and if so to have their claim for the balance against him as little as possible. . . . . ''

Again on May 5th:

''No doubt you have received a letter from us in the meantime telling you that we would be in a position this week to advise you what the Harrodsburg Bank desires. We have arranged for a conference tomorrow with the bank people and will notify you immediately.''

Prior to the appointment of Corbett, James as president of the bank, though at the suggestion of Thompson, had been in communication with William Rosenstein, a real estate broker in Brooklyn, in reference to a sale of the property, and on the 18th of May, 1922, wrote him in his own hand:

''Dear Sir: Your letter dated the 15th just to hand. We would not accept your offer so I did not think it necessary to keep on writing. I have put the property in the hands of Hal S. Corbett as attorney, with power of attorney to sell and convey by deed. Mr. Dyke Hazelrigg of this section will be in New York by the time you get this. He and Corbett are authorized to do business for us. I gave him your address. Hoping you may be able to do business with them. Respectfully, F. P. James, President.''

On May 19th the bank wrote Corbett:

''With reference to our property situated at 848 Manhattan, Brooklyn, N. Y., and concerning which through our local attorney have been consulting you, we wish to hereby directly authorize that you take this matter up with Mr. Julius Seigelman, 887 Manhattan avenue, Brooklyn, N. Y., and do whatever is necessary to straighten this matter out.

''We have written Mr. Seigelman that he turn over all our papers to you, and we presume that he

will do this without further delay. We have had considerable correspondence with Mr. Seigelman, and without going into detail it does not seem to have been satisfactory to either side in so far as accomplishing anything is concerned. Finally, Mr. Seigelman demanded a fee of $500, which we certainly thought very unreasonable, under the circumstances. Of course, Mr. Seigelman is entitled to a reasonable fee for what he may have done, and you are authorized to adjust the matter of fee with him upon his turning over to you all papers in the case. We sincerely hope that you will press this matter to an early conclusion, and that from time to time you will report to us the progress you are making.''

A few days previous to the date of the last letter Corbett visited Frankfort and met Thompson and Hazelrigg at the latter's office. Hazelrigg advised a sale of the property thinking this would relieve Col. Thompson's anxiety. Thompson assented and the matter was taken up with the bank which agreed, and on May 17th the bank executed duplicate powers of attorney to Corbett and Hazelrigg authorizing them to sell and convey the property and collect the consideration but not fixing the price. Thereafter all of the New York end of the business was conducted by Corbett, who at once began negotiating for a sale of the property. Beginning with June 15, 1922, a number of telegrams and letters passed between the parties. Corbett had a net offer of $30,225. Hazelrigg advised acceptance. Col. Thompson was reluctant, but on July 3d he agreed and directed the bank to wire acceptance. On July 15, 1922, a contract of sale was signed by Corbett and the purchaser. The purchase price was $30,-225 net, of which $1,000 was paid in cash, the deal to be closed on August 15th, at which time deed was to be delivered, possession given, and the remainder of the consideration paid. On an examination of the title, it developed that the Hargate Corporation had executed a lease for five years to one Rose Resseler who refused to vacate. Litigation was required to dispossess her, and on August 15th an extension agreement was made postponing the closing of the sale 90 days; the purchaser paying some additional consideration. Out of this Corbett paid past-due rentals and taxes amounting to $3,976, and remitted $2,024 to the bank, which was placed to Col.

Thompson's credit; and on September 7th Corbett wrote the bank, explaining the continued delay and saying:

"When we get this woman out of possession and put our purchaser in possession, I will prepare the deed for you and forward it to you for execution. You will in turn, attach a sight draft to the executed deed and send it to some bank which you may designate here in Brooklyn, with direction that the deed is to be delivered when the sight draft is to be paid."

The litigation with Rose Resseler continued to delay delivery of possession to the purchaser, and on November the 11th the time for closing the deal was extended to December 11, 1922, and on the latter date was again extended to January 20, 1923, and the contract modified so as to authorize the purchaser to give a 5-year mortgage on the property for $16,000. On January 20, 1923, a further extension was made to February 14, 1923, and on that date the closing time was extended to March 15, 1923. It had been understood all along that the sale was a cash transaction. Neither Hazelrigg, Thompson, nor James had contemplated any other terms, and Corbett kept them in the dark as to what was really transpiring. However, on March 12, 1923, Mr. James as president of the bank, at his office in Harrodsburg, executed and acknowledged a deed to the purchaser, Anton Berger, in accordance with the modified terms for the recited consideration of $100 cash and other good and valuable considerations and subject to the $16,000 Freudenberger mortgage, which we have heretofore seen had been paid and assigned to the bank. Mr. James is not clear as to how he received this deed, but thinks it was presented to him by Col. Thompson, a matter Col. Thompson vigorously denies. In explaination Mr. James says he did not read the deed, nor learn of the provision for the assumption of the mortgage. On the 9th of March, 1923, Mr. James as president of the bank met Mr. Corbett in an attorney's office in Lexington and there executed three instruments in triplicate: (1) a contract with Anton Berger, the grantee in the deed, extending the time of payment of the $16,000 Freudenberger mortgage for a period of five years from March 16, 1923. (2) A written assignment of the Freudenberger mortgage to Hal S. Corbett "for the recited consideration of $16,000 paid." (3) Another extensive and elaborate power of attorney to Corbett giving him plenary power to act in the

premises. These papers were executed and acknowl-
edged by James as president of the bank, though he de-
nies receiving any money from Corbett, and there is no
evidence that he did except the recitation mentioned.
James claims that he was authorized to do this at a meet-
ing held in Judge Hazelrigg's office, in Frankfort, on the
preceding afternoon, in which he, Corbett, Judge Hazel-
rigg, Dyke Hazelrigg, and Col. Thompson were present.
Dyke Hazelrigg and Col. Thompson deny this statement
in toto, and say that no such meeting ever was had or
agreement made. Dyke Hazelrigg testifies that Cor-
bett was never in his office but once, and that was in May,
1922, while Col. Thompson shows conclusively that he
was not in Kentucky at that time. Hazelrigg and Thomp-
son further testify that they never had any intimation
whatever of a change of terms of the deed until the facts
were developed long after this. Judge Hazelrigg is dead,
and Corbett has not testified. Having obtained posses-
sion of these papers Corbett returned to New York and in
May, 1923, assigned the mortgage to the wife of the pur-
chaser for a cash consideration of $7,000 and a deferred
payment of $9,000, due January 5, 1924. It developed
that the Freudenberger mortgage had been misplaced,
and Corbett filed suit in the King's county probate court
asking permission to cancel it upon the record without
producing the bond, and on May 9, 1923, F. P. James as
president of the bank made an affidavit as to its being
lost. Corbett was successful in this suit and on June 14,
1923, received the remainder of the consideration and the
mortgage was released of record. It appears, however,
that after the delivery of the Rowley deed to the bank
this mortgage had been returned to Col. Thompson and
placed in his safety box where it was found during this
litigation. During this period of time much correspond-
ence ensued between Corbett and the various Kentucky
parties, several letters being written by Col. Thompson;
and on December 19, 1923, Mr. James wrote Corbett:

"I regret very much to annoy you about the
Thompson property sold. Thompson practically
owes the bank the amount due from that transaction.
You have the original mortgage that seems to be the
stumbling block in closing this deal. We have been
promising the national bank examiners for some
time that the money from that source would soon be
forthcoming to pay his indebtedness. It has gotten

to the point that it is very embarrassing to us, so I do hope you will use every effort to get the matter closed up.

"We want you to deduct your fee or let us know the amount we owe you, so we can pay it out of this money. As you know, Mr. Thompson is 79 years old and not very robust, and the bank don't want any trouble hereafter over the matter. With the original mortgage paid by the bank in the hands of the purchaser, it would seem to us that he would be perfectly safe in making us a substantial payment on this property in addition to what he has already paid.

"I suppose that you will eventually get considerable rent that is due us."

Under date January 31, 1924, Thompson wrote Corbett:

"Dear Corbett: If there is any way in the world to get that purchase money immediately to the Harrodsburg Bank, I wish you would do so, as the bank seems to be very needy for its money. As I have written you before I will compel by reason perhaps of the delay in getting this purchase money compelled to pass its usual dividends in January."

On June 27, 1924, Corbett wrote the bank inclosing a check for $600, which the bank placed to the credit of Col. Thompson's account. During all this time Corbett was writing long leters of explanation and continued to postpone the matter until December, 1925, when an attorney for the parties visited New York and after an investigation discovered that the entire purchase money had been paid him, and that he had embezzled it, whereupon he made a full confession of the facts. He was utterly insolvent, and no further collections were made.

1. Without a reiteration of the facts, it is practically admitted by Col. Thompson, and it is clearly evident, that the title to this property was placed in the bank as security for Col. Thompson's indebtedness then existing and prospective, and as a matter of convenience for him in the complicated state of his affairs, and that he was given free rein in its management and directed and approved all that the bank did. This would not constitute a technical trust making the bank liable for a mismanage-

ment of the property, and the court did not err in refusing to submit to the jury the issue as to the losses of rents occasioned by the bank's alleged negligence in that regard.

2. The nature of the business was such as to require the employment of skilled attorneys and of special agents in New York. Hazelrigg is well known to be a man of the highest integrity and an exceptionally able lawyer, and Corbett was so regarded at that time, and Col. Thompson authorized and approved their employment; so if the bank is to be regarded as the agent of Col. Thompson, it is not liable for negligence in Corbett's employment, Mechem on Agency, sections 316, 322, 490, 491, 499; 21 R. C. L. 86; 2 C. J. pp. 688-691; Tippecanoe T. & L. Co. v. Jester, 180 Ind. 357, 101 N. E. 915, L. R. A. 1915E, 721; and the same rule would apply even if the bank is to be regarded as the trustee for Col. Thompson, McRoberts v. Carneal (Ky.) 44 S. W. 442; Donaldson v. Allen, 182 Mo. 626, 81 S. W. 1151; In re Howard, 185 N. Y. 539, 77 N. E. 1189; Phillips v. Burton, 107 Ky. 88, 52 S. W. 1064, 21 Ky. Law Rep. 720; hence there was no issue on this point to be submitted to the jury.

3. However, the status of the parties is not in all respects fixed by the above conclusions. Without being a technical trustee, the bank was acting as agent for Col. Thompson, also it had its own interests to serve; and this raises the question, was Corbett solely the agent of Col. Thompson or was he the agent of both Col. Thompson and the bank? He was employed at the instance of Col. Thompson. There is evidence that Col. Thompson wrote him frequently and arranged his fee. Mr. James claims that the bank was a mere instrument in the hands of Col. Thompson and upon which he played at will, and some of the earlier transactions lend color to this view. But when it came to the negotiotions for the sale of the property, a matter in which the bank was vitally interested, the evidence indicates that it did more than merely comply with Col. Thompson's wishes. While it was consulted as to Corbett's employment and as to the execution of the power of attorney, and assented to both, its activities were not confined to mere assent. In his letter to Rosenstein on May 18th, James asserts that Corbett was the bank's agent as he does in his leter to Corbett on May

19th. That Hazelrigg so understood is indicated in his letter of May 4th to Corbett, in which he says:

"As Col. Thompson has no interest in the matter other than to see that the bank gets its debt, which is probably more than the property will bring and, if so to have their claim for the balance against him as little as possible."

And Hazelrigg always wrote duplicate letters and made duplicate reports to each, and both corresponded with Corbett; it appearing that Col. Thompson always stressed the bank's interest in his letters. Such payments as were made by Corbett were paid directly to the bank, and it does not appear that it was ever contemplated that Corbett should make any payments to Col. Thompson. Further, according to the testimony of Thompson and Hazelrigg, James later ignored them altogether and assumed full control over Corbett in the execution of the Berger deed, the extension of the Freudenberger mortgage, and the written assignment of it to Corbett without their knowledge or consent. We thus find the bank with the legal title to and an equity in the property of over $12,000, while Col. Thompson was the beneficial owner subject to the bank's debt and had an equity in it for the remainder; it thus appearing that both were interested and both concurred in the employment of Corbett. If it was intended by such employment for Corbett to act as the agent of each to the extent of his respective interest and the bank retained its right to control and direct his actions, or continued to assert such control, he became its agent to the extent of its interest and Thompson would not be liable to it for its loss occasioned by his defalcation and should not be required to pay its lien debts existing at the time of such defalcation. There was an issue of fact on this question which should have been submitted to the jury under proper instructions.

Elaborating on the above conclusion, it is true that the bank's interest was equivalent to that of a mortgagee, but its action in asserting its rights (*as is claimed by defendant*); is not analogous to a case in which a creditor surrenders to an agent selected by his debtor, collateral pledged for his debt for the purpose of collection, as in such case the debtor assumes full liability for the acts of *his* agent. Nor is it analogous to a case in which a mortgagee agrees for an agent employed by the mortgagor to

sell the mortgaged property and collect the proceeds, as in such instance the mortgagee surrenders all control over the conduct of the agent. But as thus predicated we have a case in which both parties act concurrently for their joint interest and in which to the extent of its debt the bank is as much the principal of the agent so employed as it would have been had it brought suit for the enforcement of its claim and its attorney had defaulted. In such state of case we feel that Corbett would be the agent of both and of each to the extent of his respective interest.

4. The prima facie evidence of payment to James of the $16,000 arising from the written assignment of the mortgage is completely refuted not only by James' testimony, but by uncontradicted fact that Corbett then had no funds with which such payment could have been made, and such issue need not be submitted. Further, the court is of the opinion that the evidence as to the *effect* of James' action in extending the time of payment and assigning the Freudenberger mortgage to Corbett is so indefinite and speculative that it cannot be said with any degree of certainty that a loss was occasioned thereby; and therefore such evidence is insufficient to authorize a submission of this question to the jury.

In conclusion, it might be said that the issues here presented are largely equitable. A motion was made by appellee to transfer to equity and never acted upon. But it is unnecessary to discuss questions of practice as the above conclusions leave but a single issue triable by jury. The instructions of the court not being in accord with the above views, the judgment is reversed and cause remanded for proceedings consistent with this opinion.